IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROBERT KOISCH,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )        Civil Action No. 1:08cv649
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of                   )
Social Security,                  )
                                  )
        Defendant.                )


<u>MEMORANDUM OPINION</u>


     Pursuant to 42 U.S.C. § 405(g), Robert Koisch ("plaintiff")
seeks judicial review of the final decision of the Commissioner
of Social Security ("defendant") denying plaintiff's claim for
disability insurance benefits under Title II of the Social
Security Act ("SSA" or "the Act"), 42 U.S.C. §§ 401-433.
Specifically, plaintiff brings this action to review the decision
of the Commissioner of Social Security that plaintiff was not
disabled any time prior to November 27, 2007, the date of the
denial decision made by an administrative law judge (ALJ).  The
record has been filed and the case is now before the Court on
cross motions for summary judgment.

     In his Motion for Summary Judgment, plaintiff contends
defendant's decision should be reversed because: (1) the
determination that plaintiff can perform alternate jobs that

exist in the national economy relies on vocational testimony that differs from the functional capacity findings in the decision, and (2) the ALJ improperly ignored and rejected the treating and examining physician's opinions of disability and plaintiff's work-related limitations.  By contrast, defendant urges this Court to uphold the denial of plaintiff's benefits because substantial evidence exists in the record to support the ALJ's decision that plaintiff was not disabled within the meaning of the Act, and because the ALJ applied the correct legal standards in reaching the decision.

## I.  PROCEEDINGS

Plaintiff protectively filed a claim for disability insurance benefits ("DIB") on November 4, 2005 (Administrative Record ("R.") at 14-28) alleging that he became disabled on October 31, 2005 due to depression with psychotic features and anxiety. (R. at 111, 131.)  After initial denials and timely appeals, an ALJ held a hearing on August 1, 2007[1] (R. at 29-50) and issued a denial decision on November 27, 2007.  (Id. at 14-28.)  On May 9, 2008, the Social Security Appeals Council ("Appeals Council") denied plaintiff's request for review of the ALJ's decision, thereby rendering the ALJ's decision final. Pursuant to 42 U.S.C. § 405(g), plaintiff, having exhausted his

---

[1] Plaintiff appeared at the hearing, with representation, and presented oral testimony.  (R. at 29-50.)

administrative remedies, timely filed the instant action for
judicial review.

## II.   FACTS OF RECORD

### A.   Plaintiff's Personal Background

Born on October 30, 1952, plaintiff is now 56 years old.
(Plaintiff's Motion for Summary Judgment 2.)  Plaintiff completed
high school and college and worked for nearly 29 years as a
social worker and outreach counselor for the Prince William
County Department of Social Services.  (R. at 118-20, 204.)  As
an outreach counselor, plaintiff managed a caseload of five to
nine juvenile offenders who were awaiting a new court date and
was tasked with ensuring that the juveniles did not relapse or
accumulate additional charges before they returned to court.
(Id. at 204-05.)  Among his many duties, plaintiff conducted home
visits and helped the juveniles find jobs, avoid problems with
gangs and comply with conditions set by the court.  (Id. at 205.)
He also referred juveniles and/or their family members to
resources such as mental health, social services, and drug
treatment programs.  (Id.)  Plaintiff's job required him to
appear in court to present reports on a juvenile's progress and
he would often remain on a case after a juvenile had been found
guilty.  (Id.)  Most of the families plaintiff worked with were
dysfunctional and had few resources and many of the juveniles
were violent or had been accused of felony crimes.  (Id.)  A

3

large number also had substance abuse issues. (Id.)  As part of

his responsibilities, plaintiff drove 40 to 80 miles a day and

made approximately 30 home visits per week. (Id.)

Plaintiff has not engaged in any substantial gainful

employment since October 31, 2005 and his current means of

support is Disability Retirement Income through the Virginia

Retirement System ("VRS"). (Id. at 19, 35, 204.)  Plaintiff

began receiving the disability retirement income about October

2005. (Id.)  According to the ALJ's findings, plaintiff is

unable to perform his past relevant work as an outreach counselor

because such job subjects plaintiff to more than minimal contact

with the public. (Id. at 26.)  The ALJ further determined that

plaintiff meets the insured status requirements of the Social

Security Act through December 31, 2009. (Id. at 19.)

B.   Plaintiff's Medical History

1.   **Mental Health Issues**

The evidence shows plaintiff has two severe impairments: (1)

affective disorders and (2) generalized anxiety disorder. (Id.

at 19.)  Plaintiff has struggled with depression since 1977 and

has been in treatment on and off since that time. (Id. at 23,

36, 204.)  According to plaintiff, his depression worsened when

he was diagnosed with diabetes. (Id. at 36.)  Plaintiff has been

treated by Dr. Benjamin Adewale, M.D., a board certified

psychiatrist, once every two weeks since May 1997. (Id. 21, 39-

40, 273.)  Dr. Adewale sees plaintiff for medication management and psychotherapy and opines that plaintiff has been "chronically mentally ill" for as long as Dr. Adewale has been treating him. (Id. at 273.)  According to Dr. Adewale, plaintiff suffers from major depression with psychotic features and bipolar disorder depressed type.  (Id. at 21, 273-77.)

        a.  Dr. Adewale

On February 12, 2005, Dr. Adewale completed a Physician's Report for the VRS to determine whether plaintiff qualified for VRS disability retirement.   (Id. at 200-01.)  Dr. Adewale opined that plaintiff exhibited anxiety disorder and chronic major depression with psychotic features.   (Id. at 200.)  Plaintiff's response to medication[2] was fair and his symptoms were manageable, yet Dr. Adewale concluded that plaintiff was incapacitated from further performance of his job and that such incapacity likely would be permanent.  (Id. at 201.)

On October 31, 2005, Dr. Adewale completed a Medical Assessment of Mental Status questionnaire.  (Id. at 195-99.)  In the report, Dr. Adewale stated that plaintiff remained fragile and unpredictable despite his medication regime and that plaintiff presented symptoms of a depressive syndrome and an

---

[2] Plaintiff's current medication includes Klonopin for anxiety, Elavil, an anti-depressant to help him sleep, and Valium, a muscle relaxer.  (R. at 24, 243.)

anxiety-related disorder.  (Id. at 195, 197-98.)  According to
Dr. Adewale, plaintiff remained at home in seclusion, did not
engage in any socialization and could not perform his job
functions as they required socialization.  (Id. at 198-99.)  Dr.
Adewale further stated that plaintiff's condition had caused a
marked restriction of the activities of daily living, marked
difficulties in maintaining social functioning, frequent
deficiencies of concentration, persistence or pace, and repeated
episodes of deterioration or decompensation in work or work-like
settings.  (Id. at 197-98.)

        On November 14, 2006, Dr. Adewale completed a Mental Status
Evaluation Form, in which he reported that plaintiff was a
"loner," had no family relationship with his siblings, was
isolated most of time, and had low energy, increased fatigue and
chronic pain.  (Id. at 273-74.)  Additionally, Dr. Adewale
reported that plaintiff usually remained at home and had poor
coping skills and no friends.  (Id.)  Dr. Adewale further opined
that plaintiff was restless, impulsive, and only partially
oriented to time, place and person.  (Id. at 275.)  Plaintiff's
mood appeared depressed and alternated with hypomania.  (Id.)
Although plaintiff's immediate memory was poor, his recent and
remote memories were fair.  (Id.) Moreover, his thought content
and organization were impaired and he reported being confused and
having para-psychotic episodes.  (Id. at 275-76.)  According to

Dr. Adewale, plaintiff had poor judgment, could not function under stress, and exhibited poor concentration, persistence and pace. (Id. at 276.) Dr. Adewale concluded, however, that although plaintiff was chronically mentally ill, he could manage his own finances. (Id. at 277.)

        b.  Dr. Hoskins-Propst

        On February 8, 2006, plaintiff was seen by psychologist Dr. Eric Hoskins-Propst, Psy.D., who is a Social Security consultative examiner. (Plaintiff's Memo. in Supp. of Summary J. 3; R. at 238-41.) Dr. Hoskins-Propst performed a consultative mental examination of plaintiff. (R. at 238-41.) Plaintiff told Dr. Hoskins-Propst that he suffered from depression with fatigue and experienced moderate anxiety in social situations and mild anxiety at other times. (Id. at 208.) According to plaintiff, the anxiety worsened in the context of his work. (Id.) Plaintiff further stated that he had two close friends with whom he socialized once a week. (Id. at 239-40.) Plaintiff stated that had been sober since March 2005 and attended Alcoholics Anonymous ("AA") meetings every other week. (Id. at 240.)

    According to Dr. Hoskins-Propst's report, plaintiff established rapport quickly and did not have trouble maintaining conversation. (Id.) Plaintiff appeared alert and thoughtful and was cooperative. (Id.) His mood was mildly anxious and sad and his affect, although somewhat subdued, was appropriate. (Id.)

Plaintiff stated that he had suicidal ideation, but denied having any specific plan or intent to harm himself.  (Id.)  He could immediately recall three words, but could only recall one of the words after a brief delay.  (Id.)  Plaintiff had no trouble recalling personal history and presented past events with adequate detail.  (Id.)  His thought processes were organized and clear and his attention and concentration were good.  (Id.) Plaintiff adequately performed a variety of simple math, spelling and memory exercises.  (Id.)  According to Dr. Hoskins-Propst, plaintiff's insight was good and his responses to hypothetical social situations demonstrated that he had good judgment.  (Id.)

Dr. Hoskins-Propst assessed plaintiff as having alcohol dependence, generalized anxiety disorder and mild major depressive disorder and assigned plaintiff a Global Assessment of Functioning ("GAF") score of 50.[3]  (Id.)  Dr. Hoskins-Propst further determined plaintiff could function independently, had a modest level of social activity and that plaintiff's negative attitude toward work probably stemmed more from "burnout" than from incapacity due to mental illness.  (Id. at 241.)

---

[3] The GAF scale considers an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness.  A GAF score of 41 to 50 indicates that an individual has serious symptoms or any serious impairment in social, occupational, or school functioning.  See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. Text Revision 2000).  The GAF range of 51-60 corresponds to moderate symptoms.  Id.

Dr. Hoskins-Propst also completed a functional assessment of plaintiff, in which he concluded that plaintiff could perform simple and repetitive tasks, was slighting impaired in performing detailed and complex tasks, moderately impaired in maintaining regular work attendance, not impaired in completing work assignments without extra supervision, slightly impaired in completing the work day without psychiatric interruptions, not impaired in following instructions, not impaired in interacting with co-workers and the public, and mildly impaired in dealing with usual stresses that arise in competitive work situations. (<u>Id</u>.)

c.  Dr. Smoller

Plaintiff was referred by the Virginia Retirement System to Dr. Bruce Smoller, M.D. for an independent psychiatric examination.  (Plaintiff's Memo. in Supp. of Summary J. 3; R. at 242-57.)  On February 16, 2006, plaintiff met with Dr. Smoller and stated that emotional problems kept him from performing his work duties.  (R. at 253.)  Dr. Smoller noted that plaintiff appeared depressed and anxious, but had no word retrieval problems or difficulty concentrating.[4]  (<u>Id</u>. at 252-53.)  During his visit with Dr. Smoller, plaintiff presented with passive suicidal ideation, but exhibited no sign of psychosis or thought

---

[4] Specifically, plaintiff appeared mildly slowed in thinking and action, but his stream of thought was logical and coherent and his memory seemed intact.  (<u>Id</u>. at 252.)

9

disorders.[5]  (Id. at 252.)  Plaintiff demonstrated good judgment
and insight.  (Id.)

According to Dr. Smoller, plaintiff's best level of
functioning in the past year was fair and was poor to fair at the
time of the examination.  (Id.)  Plaintiff exhibited major
depressive episode of a recurrent and long-standing nature as
well as a dependent personality disorder.  (Id.)  Dr. Smoller
eventually concluded that plaintiff met the criteria for
disability-based depression under the Virginia Code and further
determined that plaintiff's impairment probably prevented him
from performing his duties as an outreach counselor.[6]  (Id. at
253.)

d.  Dr. Kalil

On November 27, 2006, A. John Kalil, Ph.D., a state agency
psychologist, completed a Psychiatric Review Technique form
("PRT") after reviewing plaintiff's medical records.  (Id. at
283-96.)  According to Dr. Kalil, plaintiff had mild major
depressive disorder, generalized anxiety disorder, and alcohol

---

[5] Indeed, Dr. Smoller's report explicitly states: "In fact,
I do not see any thought disorders.  Dr. Adewale has labeled
[plaintiff] psychotic depression.  I do not see any of these
psychotic components that Dr. Adewale does."  ®. at 253.)

[6] Pursuant to Virginia Code § 51.1-156(E), a state employee
in the Commonwealth of Virginia is eligible for disability
retirement if, since the effective date of retirement, he is and
has been continuously mentally or physically incapacitated from
the further performance of duty, and that incapacity is likely to
be permanent.  Va. Code. Ann. § 51.1-156 (2009).

dependence.  (Id. at 286, 288, 293.)  Additionally, plaintiff had

moderate difficulties maintaining concentration, persistence or

pace, mild restrictions of the activities of daily living,

difficulty maintaining social functioning, and no episodes of

decompensation.  (Id. at 294.)

Dr. Kalil also completed a Mental Residual Functional

Capacity ("RFC") Assessment, in which he opined that plaintiff

was had moderate limitations in some activities, including

carrying out detailed instructions, maintaining attention and

concentration for long periods, completing a normal workday and

week without psychologically-based interruptions, performing at a

consistent pace without an unreasonable number of rest periods,

and appropriately interacting with the general public.  (Id. at

279-82.)  According to Dr. Kalil, plaintiff was not significantly

limited in carrying out simple instructions, maintaining regular

attendance, accepting criticism from supervisors, getting along

with co-workers, and maintaining socially-appropriate behavior.

(Id. at 279-80.)  Thus, Dr. Kalil concluded that, despite the

limitations resulting from his mental impairments, plaintiff had

the RFC to meet the basic mental demands of competitive work on a

sustained basis.  (Id. at 282.)

e.  Plaintiff's Affidavit

On November 18, 2005, plaintiff submitted an affidavit to

the VRS, in which he stated that he had last worked as an

11

outreach counselor for the Prince William County Department of
Social Services on March 31, 2005 and officially retired on
October 31, 2005.  (Id. at 204.)  He further stated that, despite
ongoing struggles with anxiety and depression since 1977, he had
maintained employment as an outreach counselor since 1980 and had
received good performance evaluations.  (Id.)  According to
plaintiff, his condition deteriorated during his last year of
work and he was no longer able to perform the requirements of his
job.  (Id.)

### 2.  Diabetes mellitus

In April 2004, plaintiff was diagnosed with diabetes
mellitus, Type II, also known as non-insulin dependent diabetes
mellitus or adult-onset diabetes.  (R. at 211, 213, 234, 235.)
Dr. Richard Mugol, M.D., plaintiff's primary care physician
prescribed medications to treat the diabetic condition as well as
medications to treat plaintiff's hypertension and hyperlipidemia.
(Id. at 235.)  Dr. Mugol saw plaintiff for follow-up visits in
2004 and 2005.   (Id. at 21, 228, 230-34.)  On a January 3, 2006
visit to Dr. Mugol, plaintiff had no new complaints.  (Id. at 21,
227.)

On February 17, 2005, Dr. Mugol completed a Physician's
Report for VRS and diagnosed plaintiff as having uncontrolled
type 2 diabetes and chronic fatigue.  (Id. at 193-94.)  Dr. Mugol
also opined that plaintiff was incapacitated from further

12

performance of his job and that the incapacity likely would be permanent.  (Id.)  Between September 2005 and December 2005, plaintiff attended educational sessions at Inova Fair Oaks Hospital in order to learn how to manage his diabetes.  (Id. at 210-26.)

### 3.   Other Maladies

Plaintiff also has a history of fracture of the left wrist with occasional residual pain and swelling with overuse, which has been diagnosed as deQuervian's tenosynovitis, an inflammation of a tendon.  These conditions are followed by Dr. Mugol and Dr. David Miller, M.D., an orthopedist.  (Id. at 20-21, 228, 304.) Dr. Miller evaluated plaintiff for left wrist pain on September 1, 2006.  (Id. at 303-04.)  At that time, Dr. Miller diagnosed the deQuervain's tenosynovitis and recommended gradual mobilization, icing, anti-inflammatory medications and a thumb splint.  (Id. at 304.)

On November 13, 2006, James M. Hurst, D.P.M., a podiatrist, saw plaintiff regarding an enlarged bump on the top of his left foot.  (Id. at 300-01.)  Dr. Hurst diagnosed the bump as a ganglion/sebaceous cyst.  (Id. at 301.)  On November 21, 2006, Dr. Hurst surgically excised a soft tissue mass from plaintiff's left foot.  (Id. at 298-99.)

C.   <u>January 12, 2006 ALJ Hearing</u>

**1.  Plaintiff's Testimony**

At his hearing, plaintiff testified to the following information.  He completed high school and college and worked for nearly 29 years at the Prince William County Department of Social Services in Manassas before going on Virginia Disability Retirement.  (R. at 35.)  For 25 of the 29 years with the County, plaintiff worked as an outreach counselor.  Plaintiff testified that his job was very active and required him to make six to ten home visits per day, appear in court to testify or report to the judge, and work with juvenile delinquents and their families. (<u>Id</u>. at 35-37.)  According to plaintiff, the job was stressful at times. (<u>Id</u>. at 36.)

Plaintiff further testified that he had wrestled with depression since 1977 and believed that his condition was exacerbated when he contracted Type II diabetes.[7]  (<u>Id</u>. at 36.) After the diabetes diagnosis, plaintiff began to have a lot of trouble with depression and was unable to focus or concentrate for long periods of time.  (<u>Id</u>.)  Eventually, plaintiff "got to the point" where he could no longer perform the requirements of his job because the depression became too much and he lacked energy.  (<u>Id</u>. at 37.)  Plaintiff stated that he no longer had

---

[7] Plaintiff stated that his diabetes is being successfully treated.  (R. at 37.)

interest in activities he used to do, such as exercising, visiting family, going to the beach and reading. (_Id._) Additionally, plaintiff testified that he had experienced suicidal thoughts, but did not believe he was the kind of person who would ever act on such thoughts.[8] (_Id._ at 38.)

Plaintiff's symptoms include difficulty falling asleep and, when he does get to sleep, trouble getting up in the morning. (_Id._) Plaintiff testified that on a normal day, he gets up between 10:00 am and 11:00 am, has a bowl of cereal, reads the newspaper, watches "too much tv" and tries to clean up the house a little bit. (_Id._ at 42. ) On the days that he leaves the house, he usually goes out in the early afternoon to the grocery store or a membership warehouse. (_Id._) Every couple of weeks, plaintiff goes to lunch with neighbors or with one of the handful of people he has kept in touch with from his job, but noted that he did not have a social life outside of those few activities. (_Id._ at 38.) Plaintiff testified that sometimes does not have the energy to perform daily functions such as paying his bills and other activities that involve meeting a deadline. (_Id._ at 39.) For example, he stated that he cleans his house irregularly and often does not leave the house for a day or two.

---

[8] In response to questioning by his attorney, plaintiff stated that his suicidal ideation involved shooting himself, but also specifically noted that he did not own a gun. ®. at 38.)

15

Plaintiff testified that sees Dr. Benjamin Adewale once every two weeks and that Dr. Adewale has prescribed medication to address his ailments.  (Id. at 39-40.) Specifically, plaintiff takes Klonopin, an anti-anxiety medication, Valium, a muscle relaxer, and Elavil, an anti-depressant he takes at night to help him sleep.  (Id. at 40.) Plaintiff has good days and bad days. (Id.)  On good days, he is able to leave the house, goes to the grocery store and gets things done, cleans his house and calls his sister in California.  (Id.) Plaintiff noted that the days he meets friends for lunch are good days.  (Id. at 43.)  A bad day involves not leaving the house or doing anything.  On bad days, he sleeps most of the day, lacks energy and may not shower or groom himself.  (Id. at 40.)  Plaintiff testified that he has about two bad days a week.  (Id.)  According to plaintiff, his old exercise routine included walking a couple of miles and using hand weights, but that he no longer exercises regularly as he lacks energy.  (Id. at 44.)

Plaintiff also testified that he has struggled on and off for many years with alcohol dependence, but has been doing better since he left the outreach counselor job.  (Id. at 41.) Plaintiff attends AA meetings, but, at the time of the hearing, was attending less frequently because he did not feel the urge to drink.  (Id. at 41-42.)  Plaintiff attributed his improvement to

not having to work every day and the resulting reduction in stress.  (<u>Id</u>. at 42.)

### 2.   **Vocational Expert's Testimony**

At the hearing, the testimony of the Vocational Expert ("VE"), Dr. James Michael Ryan, revealed the following information.  Plaintiff's past relevant work as an outreach counselor was light exertional and skilled work.  (<u>Id</u>. at 45.) Dr. Ryan testified that a person of plaintiff's age, education and working activity, who was able to perform work at all exertional levels but had minor difficulties in social functioning, concentration, persistence or pace and was therefore limited to performing simple, routine, unskilled tasks involving no more than minimal contact with the public would be unable to perform plaintiff's past work.  (<u>Id</u>.)  However, a person with such characteristics would be able to perform other jobs in the national or regional economy.[9]  (<u>Id</u>.)  For example, such a person could perform light, unskilled work, including grading and

---

[9] Dr. Ryan defined the relevant regional economy to be the Greater Baltimore-Washington Metropolitan area.  (R. at 46.)

sorting worker,[10] packer and packaging worker[11] and laundry worker.[12]

Dr. Ryan further opined that a person of plaintiff's age, education and work experience who had a combination of impairments that included diabetes and a major depressive disorder, and who also had wrist problems such that the person would be able to do only occasional reaching and pulling, and who had marked problems in concentration, persistence and pace, and an inability to deal with normal work stress would have a residual functional capacity that would prevent the individual from being employed on a full-time and regular basis. (Id. at 46-47.) Finally, Dr. Ryan testified that, with respect to entry-level, unskilled positions, an individual who misses four days per month likely would be unemployable. (Id. at 47-48.)

### III.   APPLICABLE LAW

To be found disabled, a claimant must have:

an inability to do any substantial gainful activity by reason of any medically determinable physical or mental

---

[10] According to Dr. Ryan, there are 78,000 such positions in the national economy and 1,150 in the local economy.

[11] Dr. Ryan testified that there are 64,000 packer and packaging worker positions in the national economy and 900 in the local economy.

[12] Dr. Ryan explained that the position of laundry worker typically involves folding, separating clothes prior to washing, and again aligning and separating clothes in accordance with certain procedures. 71,000 such positions exist in the national economy and 1,100 in the local economy.

18

impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve months.

42.  U.S.C. § 423(d)(1)(A).  See also 20 C.F.R. § 404.1505(a).

Defendant's regulations require an ALJ to evaluate a person's claim for disability insurance benefits under a five-step sequential process (the "process"). 20 C.F.R. §§ 404.1520(a); Reichenbach v. Heckler, 808 F.2d 309, 311 (4th Cir. 1985).  The process requires defendant to consider whether a claimant: (1) is currently engaged in substantial gainful activity[13]; (2) has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"[14]; (3) has an impairment that meets or equals the requirements of a

_____

[13] Substantial gainful activity (SGA) is defined as work activity that involves doing significant mental or physical activities and work that is usually done for pay or profit, whether or not a profit is realized.  (20 C.F.R. § 404.1572(a)-(b).; R. at 14.) If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education and work experience.  (R. at 14.)  If the individual is not engaging in SGA, the analysis proceeds to the second step.  (Id.)

[14] An impairment or combination of impairments is "severe" within the meaning of defendant's regulations if the impairment significantly limits an individual's ability to perform basic work activities.  (R. at 14.)  An impairment is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work.  (Id.; 20 C.F.R. § 404.1521.)  If the individual does not have a severe medically determinable impairment, she is not disabled, but if she does have a severe impairment, the analysis proceeds to the third step.  (Id.)

"listed" impairment;[15] (4) has the residual functional capacity[16]
to return to his past work;[17] and (5) if not, whether he can
perform other work in the national economy.[18]  (R. at 14–15.)
Although the claimant bears the burden of proving disability, a

---

[15] A "listed" impairment is one that exists in the list and
produces the associated symptoms contained in 20 C.F.R. Part 404,
Subpart P, Appendix 1.  A claimant can satisfy step three by
showing that he has a listed impairment or that he has more than
one impairment that, when combined, result in symptoms of equal
severity and duration as a listed impairment.  20 C.F.R. §
404.1523.  If the individual's impairment or combination of
impairments meets or equals the criteria of a listing and meets
the duration requirement outlined in 20 C.F.R. § 404.1509, the
claimant is disabled.  (R. at 14.)  If the impairment does not
meet or equal the criteria, the analysis proceeds to the next
step.  (Id.)

[16] As part of step four, the ALJ must determined the
claimant's residual function capacity ("RFC") as outlined in 20
C.F.R. § 404.1509.  An individual's RFC is her ability to do
physical and mental work activities on a sustained basis despite
limitations from his impairments.  (R. at 14.)  In determining
the RFC, the ALJ must consider all of the individual's
impairments, including impairments that are not severe.  (Id.; 20
C.F.R. §§ 404.1520(e) and 404.1545.)

[17] Past relevant work is worked performed, either as the
claimant actually performed it or as it is generally performed in
the national economy, within the last 15 years or 15 years prior
to the date that disability must be established.  (R. at 15.)
The past relevant work must have lasted long enough for the
individual to have learned to do the job and have been SGA.
(Id.; 20 C.F.R. §§ 404.1560(b) and 404.1565.)  If the plaintiff
has the RFC to do his past relevant work, he is not disabled, but
if he is unable to do any past relevant work, the analysis
proceeds to the next step.  (Id.)

[18] In making this last determination, the ALJ must take the
individual's age, RFC, education and work experience into
account.  (R. at 15.)  If the individual is able to do other
work, he is not disabled.  (Id.)  If the individual is not able
to do other work and meets the duration requirement, he is
disabled.  (Id.)

limited burden shifts to the defendant in the last step.  (Id. at
15.)  In order to support a finding that the individual is not
disabled, the defendant must provide evidence demonstrating that
other work exists in significant numbers in the national economy
that plaintiff can do, given plaintiff's RFC, age, education and
work experience.[19]  (Id.; 20 C.F.R. §§ 404.1512(g) and
404.1560(c).)

IV.   STANDARD OF REVIEW

This Court may not review defendant's decision de novo, but
instead must determine whether defendant's decision is supported
by substantial evidence in the record and whether defendant
applied the correct law.  42 U.S.C. § 405(g); Richardson v.
Perales, 402 U.S. 389, 401 (1971); Hays v. Sullivan, 907 F.2d
1453, 1456 (4th Cir. 1990); Coffman v. Bowen, 829 F.2d 514, 517
(4th Cir. 1987).  If so, then defendant's findings are
"conclusive," even if this Court believes defendant's assessment
of the record was incorrect.  42 U.S.C. § 405(g); Smith v.
Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); see also Laws v.
Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966) (It is not "our

---

[19] Defendant may meet the burden of showing other jobs
through use of the Medical-Vocational Guidelines of the
regulations or through the testimony of a vocational expert.  (20
C.F.R. Part 404, Subpart P, Appendix 2.)  Where plaintiff's RFC
is affected by factors which may not be reflected in the criteria
of the Medical-Vocational Guidelines, the ALJ may need to obtain
evidence from a VE to ascertain specific jobs which would
accommodate the individual's RFC.

function to substitute our judgment for that of the Secretary if his decision is supported by substantial evidence.").

"Substantial evidence in the record" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and "consists of more than a mere scintilla . . . but may be somewhat less than a preponderance" of evidence. Hays, 907 F.2d at 1456 (internal citations and quotation marks omitted).  The correct law to be applied includes the SSA, its implementing regulations, and controlling case law.  See Coffman, 829 F.2d at 517-518.  With this standard in mind, the Court next evaluates the ALJ's findings and decision.

## V.   ALJ's FINDINGS AND DECISION

In this case, the ALJ made the following findings. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2009.  (R. at 19, Finding 1.) Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date and his means of support was disability retirement income through the Virginia Retirement System.  (Id., Finding 2.)  The ALJ determined that plaintiff had two severe impairments under 20 C.F.R. § 404.1520(c): (1) affective disorders and (2) generalized anxiety disorder.  (Id. at 20, Finding 3.)  Plaintiff did not, however, have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. §§ 404.1520(d),

22

404.1525 or 404.1526.  (Id. at 21, Finding 4.)  Specifically, the
ALJ concluded that plaintiff's mental impairments, considered
singly and together, did not meet the criteria of listings 12.04
or 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1.[20]

In determining that plaintiff's ailments did not meet the
listed criteria, ALJ focused primarily on paragraph B of the
criteria listings.  To satisfy those criteria, plaintiff's mental
impairments must result in at least two of the following: marked
restriction[21] of activities of daily living; marked difficulties
in maintaining social functioning; marked difficulties in
maintaining concentration, persistence, or pace; or repeated
episodes of decompensation, each of extended duration.[22]  20
C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04(B).  The ALJ
found that plaintiff's ailments cause only mild restrictions on
his daily living.  (R. at 21, Finding 4.)  This determination was
based in part on the report from Dr. C. Eric Hoskins-Propst,
Psy.D., the consultative examiner who interviewed and examined
plaintiff.  (Id. at 238-41.)  According to Dr. Hoskins-Propst's

---

[20] Listing 12.04 is affective disorders and Listing 12.06
concerns anxiety related disorders.  Paragraph B in each of the
two listings is identical.

[21]  A marked limitation is one that is more than moderate,
but less than severe.  (R. at 21, Finding 4.)

[22] Repeated episodes of decompensation, each of extended
duration means three episodes within one year, or an average of
once every four months, with each episode lasting for at least
two weeks.   (Id.)

report, plaintiff stated that he usually wakes up around 9:00 am
and often eats out for breakfast.  (Id. at 240.) He drives his
neighbor to and from work each day and goes to membership
warehouses several times a week.  (Id.)  The youngest of three
children, plaintiff calls his siblings several times per week,
watches three to five hours of television per day and spends
about 30 minutes on the computer.  (Id.)  Plaintiff is able to
maintain his personal hygiene without assistance and usually
prepares microwave meals or buys takeout rather than preparing
meals at home.  (Id.)  He manages his own finances and does not
have a history of bankruptcy.  (Id.)

The ALJ further concluded that plaintiff has moderate
difficulties in social functioning.  During the hearing before
the ALJ, plaintiff testified that he socialized only with his
neighbors and a few friends he has kept in contact with from
work.  (Id. at 21, Finding 4.)  He occasionally goes out to lunch
with these people.  (Id.)

Plaintiff also has not experienced any repeated episodes of
decompensation of extended duration.  Thus, because plaintiff's
mental impairments do not cause at least two "marked" limitations
or one "marked" limitation plus repeated episodes of
decompensation, the criteria set out in paragraph B is not
satisfied.

Moreover, plaintiff does not meet the criteria outlined in paragraph C of Listing 12.04.[23]  Paragraph C requires plaintiff to have a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one or more of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangment."

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04(C).  The ALJ determined that there was no evidence that plaintiff has experienced repeated episodes of decompensation or that he has a residual disease process that has resulted in the marginal adjustment described in 12.04(C)(2).  (R. at 22, Finding 4.) Moreover, no evidence exists to suggest that plaintiff has a

---

[23] Although the ALJ's report does not explicitly so state, it is apparent that plaintiff also does not meet the criteria of paragraph (C) of Listing 12.06, which states that, in the event that plaintiff does not meet the criteria in (A) and (B), plaintiff must have a complete inability to function independently outside the area of one's home in order to be found to have an anxiety related disorder sufficient to meet the listing's requirements.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.06(C).

history of one or more years' inability to function outside a highly supportive living arrangement. (<u>Id</u>.)

The ALJ further determined that plaintiff has the residual functional capacity (RFC) to perform work at all exertional levels. (<u>Id</u>. at 22, Finding 5.)  However, plaintiff's moderate difficulties in social functioning and moderate difficulties in concentration, persistence or pace limit plaintiff to being able to perform simple, routine, unskilled tasks involving no more than minimal contact with the public. (<u>Id</u>.)

The ALJ concluded that plaintiff is unable to perform his past relevant work as an outreach counselor. (<u>Id</u>.)  According to Dr. Ryan's testimony at the hearing, plaintiff's past relevant work was light exertional level and skilled in complexity. (<u>Id</u>.) Plaintiff cannot perform such work because he is limited to simple routine unskilled tasks involving no more than minimal contact with the public. (<u>Id</u>.)

On the alleged disability onset date, plaintiff was 53 years old, which is defined as an individual closely approaching advanced age. (<u>Id</u>. at 26, Finding 7.)  Plaintiff has a college education and is able to communicate in English. (<u>Id</u>. at 26, Finding 8.)  The ALJ determined that it was not necessary to reach a conclusion regarding the transferability of plaintiff's job skills because, under the Medical-Vocational Rules, plaintiff was not disabled regardless of whether he had transferable job

skills.  (Id. at 27, Finding 9.)  Accordingly, pursuant to 20

C.F.R. § 404.1560(g), the ALJ concluded that plaintiff had not

been under a disability, as defined by the Social Security Act,

from October 31, 2005 through the date of the ALJ's decision.

(Id. at 28, Finding 11.)

 A. <u>Residual Functional Capacity</u>

 **1.** **RFC Determinations For Mental Impairments**

 Residual functional capacity plays an important role in the

five-step evaluative process.  At the Administrative Law Judge

hearing, the ALJ has the responsibility for assessing the

claimant's RFC.

 If a claimant has an impairment that does not meet or equal

a listed impairment under step three, but that is nevertheless

"severe," then defendant must assess the claimant's RFC for use

in steps four and five.  20 C.F.R. § 404.1520(e).  This rule

operates to give due consideration to claimants whose impairments

fall somewhere between steps two and three of the process.

Otherwise, a finding of a listed impairment would automatically

result in a "disabled" determination, while a finding that a

claimant's impairment is "not severe" would automatically result

in a "not disabled" determination under the Act.  20 C.F.R. §§

404.1520(a)(4)(ii), (iii).

 An RFC of "medium" duty work involves "lifting no more than

50 pounds at a time with frequent lifting or carrying of objects

weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).  If someone can do medium work, he can also do sedentary and light work.  Id. An RFC of "light" duty work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying light articles and small tools. 20 C.F.R. § 404.1567(a).  Sedentary jobs require occasional standing and walking.  Id.

The Social Security Administration has defined the frequency terms "occasionally" and "frequently."  "'Occasionally' means occurring from very little up to one-third of the time."  Soc. Sec. Rul. 83-10.  "'Frequently' means occurring from one-third to two-thirds of the time."  Id.

### 2.   The ALJ's RFC Determination

Plaintiff argues that the ALJ's decision regarding plaintiff's work-related limitations improperly ignored and rejected the opinions of physicians who had treated and examined plaintiff, especially the opinion of Dr. Adewale.  (Pl.'s Mem. in Supp. of Mot. for Summary J. 19.)  Additionally, plaintiff avers that the opinion of Dr. Kalil should have been afforded less weight than the opinions of the other doctors because Dr. Kalil did not actually examine or interview plaintiff.

In determining a claimant's RFC, the ALJ must follow a two step process.  First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairments that could reasonably be expected to produce the claimant's pain or other symptoms.  (R. at 22-23.)  Second, once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine to what extent they limit the claimant's ability to do basic work activities.  Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by medical evidence alone, 20 C.F.R. § 404.1529(c) describes the kinds of evidence that the ALJ must consider in addition to the objective medical evidence when determining credibility.  Such evidence includes: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of the symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any factors concerning

29

the claimant's functional limitations and restrictions due to pain or other symptoms.  (R. at 23; SSR 96-7p.)

It is clear that the ALJ considered the above-listed factors when weighing the evidence in the record.  After considering the evidence of the record, including plaintiff's testimony at the hearing and statements plaintiff made to the various doctors who interviewed him, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms plaintiff alleged, but that plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were credible only to the extent of the established RFC. (R. at 24.)

Importantly, a statement by any medical source indicating that a claimant is disabled or unable to work is not determinative of a claimant's disability status under the law and is not entitled to automatic controlling weight or special significance.  20 C.F.R. § 404.1527(d)(2); Soc. Sec. Reg. 98-5p, 61 Fed. Reg. 34, 471, 24,474 (1996).  Whether a claimant is disabled within the meaning of the Social Security Act is a legal conclusion reserved to the ALJ.  20 C.F.R. § 404.1527(e)(2).  In reaching the conclusion, the ALJ takes into account opinions from medical sources regarding whether a claimant's impairments meet or equal the requirements listed in the Act, but is not bound by them.  Id.

In this case, the ALJ clearly stated in his report that he did not give controlling weight to all of Dr. Adewale's opinions because some of them were inconsistent with other evidence in the record.  In explaining how he reached his conclusion, the ALJ noted that discrepancies existed between some of Dr. Adewale's findings and various statements made by plaintiff during his testimony at the hearing as well as statements plaintiff made to other examining physicians.

For example, Dr. Adewale stated that plaintiff is a loner, and remains secluded at home with no friends or family relationships.  In contrast, plaintiff testified that he socialized with neighbors and a few former co-workers, and called his sister regularly.  Additionally, plaintiff indicated to Dr. Hoskins-Propst that he drove one of his neighbors to and from work every day.

According to Dr. Adewale, plaintiff has been chronically mentally ill since at least 1997, yet plaintiff continued to work full-time in his job as outreach counselor from 1997 until 2005. None of Dr. Adewale's reports indicate that plaintiff's condition worsened during those eight years, which suggests that plaintiff was able to work and function during that time, despite his mental illness.  Plaintiff received good evaluations for his

work,[24] lived independently, drove a car, went out to eat, shopped at stores, followed his treatment regimen and satisfactorily handled his own finances.  Plaintiff also was able to maintain his hygiene without assistance.

Moreover, plaintiff's treatment for his symptoms includes medication, which have improved his condition, and visits with Dr. Adewale every other week.  There is no evidence that plaintiff was hospitalized or received emergency room care for a mental impairment during his alleged period of disability or sought other treatment in addition to his bi-weekly sessions with Dr. Adewale.  Plaintiff reported suicidal ideation, but insisted during his testimony that he would never harm himself.  Moreover, there is no documentation from any medical source or hospital indicating plaintiff ever received treatment for a suicide attempt.

In contrast to Dr. Adewale's statement that plaintiff exhibited poor concentration, poor judgment and impaired thinking, both Dr. Hoskins-Propst and Dr. Smoller reported that plaintiff demonstrated good memory, good judgment, no attention difficulties, and no thought disorder or signs of psychosis.

These are only a few examples of instances where Dr. Adewale's opinions were contradicted by other evidence in the

---

[24] Indeed, even Dr. Adewale also noted that plaintiff's performance of his job was fair during this period.

32

record.  Notably, Dr. Adewale's opinions are not binding on the ALJ.  Nor is the fact that plaintiff was awarded disability retirement through the VRS, which is governed by Virginia law. Plaintiff's inability to perform his past relevant work as an outreach counselor does not mean that he was disabled for the purposes of receiving DIB under the Social Security Act.  As explained in Section III above, if a plaintiff is found to be unable to perform past relevant work, the ALJ then considers whether the plaintiff can perform other work consistent with his RFC and vocational profile.  In other words, an inability to perform past relevant work does not automatically translate to a finding of "disabled" under the Act and, in this case, it is clear that plaintiff is able to perform other, less stressful work.

The ALJ also properly considered the opinions of Dr. Hoskins-Propst, who reported that plaintiff experienced a degree of emotional difficulty and opined that plaintiff's negative feelings toward work might stem from burnout rather than mental illness.  Such a conclusion is consistent with the evidence in the record.  Plaintiff's work as an outreach counselor was complex, rigorous and very stressful.  He worked with juveniles who were already involved with the legal system as well as with the families of those juveniles.  Plaintiff traveled daily for his job and made personal visits to difficult home situations.

33

It is completely understandable that one might burn out after more than 25 years in such a job.  According to Dr. Hoskins-Propst, plaintiff could function independently and was, at most, only moderately impaired in maintaining regular work attendance and moderately impaired in maintaining consistent work activities.  The ALJ's RFC determination was not inconsistent with such evidence.

Additionally, the ALJ did not improperly reject Dr. Hoskins-Propst's conclusion of a GAF score of 50 for plaintiff.  The ALJ found the score to be inconsistent with other findings by Dr. Hoskins-Propst, including the mental status findings and functional assessment also performed by Dr. Hoskins-Propst. Moreover, GAF scores do not bear a direct correlation to the disability requirements and standards outlined in the Act and, thus, do not automatically establish a disability mental impairment.  Indeed, GAF scores are opinions that should be considered alongside the multitude of other factors that an ALJ takes into account when reaching a decision.  Under the instant circumstances, the ALJ reasonably evaluated and incorporated Dr. Hoskins-Propst's opinions into the overall final decision.

Finally, the ALJ gave appropriate weight to Dr. Kalil's opinion that, despite his mental impairments, plaintiff is able to meet the basic mental demands of competitive work on a sustained basis.  Plaintiff objects to Dr. Kalil's opinion on the

grounds that Dr. Kalil was a non-examining psychological consultant.  Under the governing framework of the Act, however, an ALJ is allowed to consider findings of non-examining medical consultants as opinion evidence.  20 C.F.R. § 404.1527(f).  Indeed, an ALJ may rely on the opinions of non-examining medical professionals when those opinions are consistent with other medical evidence in the record and not contradicted by other credible evidence.  20 C.F.R. § 404.1527(f)(2)(i).

In the instant case, the ALJ noted that he gave significant weight to some of Dr. Kalil's findings because they were consistent with the record as a whole.  (R. at 26.)  For example, Dr. Kalil's opinion regarding plaintiff's ability to meet the basic demands of competitive work is consistent with Dr. Hoskins-Propst's conclusion that plaintiff can perform simple, repetitive tasks and complete work tasks without extra supervision.  Additionally, Dr. Kalil's conclusion was also consistent with Dr. Smoller's finding that plaintiff was only unable to perform his past work.  (R. at 252-53.)  Perhaps most notably, Dr. Kalil's opinion was consistent with plaintiff's own testimony and statements regarding his activities and daily living, which include waking up between 9:00 am and 11:00 am, occasionally dining out for breakfast, frequently driving a neighbor to and from work, going to the grocery store and membership warehouses, planning his meals, calling his siblings regularly, watching

35

television for several hours daily, spending time on the computer, occasionally attending AA meetings, occasionally socializing with former co-workers and managing his own finances.

The Court finds that the ALJ's properly considered the medical opinions presented to him, many of which were conflicting and inconsistent with one another.  Clearly, the ALJ evaluated the record in its entirety and adequately stated reasons for his findings.  Although plaintiff may disagree with the findings, this Court is precluded from re-weighing the facts considered by the ALJ.  See 42 U.S.C. § 405(g).  The Act tasks the ALJ, and not this Court, with the responsibility of resolving conflicts in the evidence.  Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).  The Court finds that the ALJ reasonably weighed the medical evidence in this case and made findings that are supported by substantial evidence in the record.

    3.  Available Jobs for Plaintiff

    In this case, the ALJ found that, although plaintiff had met his burden of showing that he could not perform his past relevant work (R. at 26, Finding 6.), there existed a significant number of other jobs in the national economy that plaintiff coule perform.  (R. at 26, Finding 7.)  Plaintiff now argues the ALJ's finding that plaintiff's RFC allows him to perform a significant number of jobs is fatally flawed.  (Pl.'s Mem. in Supp. of Mot. for Summary J. 18.)  Specifically, plaintiff asserts that while

ALJ's findings indicate that plaintiff has various difficulties that are moderate in nature, the VE considered only minor difficulties when opining about the number of jobs available to plaintiff in the national and local economy.  (Pl.'s Mem. in Supp. of Mot. for Summary J. 18.)

Indeed, the ALJ found that plaintiff's mental impairments impose moderate difficulties in social functioning and moderate difficulties in concentration, persistence or pace.  (R. at 22, Finding 5.)  In contrast, Dr. Ryan's conclusion regarding jobs that plaintiff could perform was based on a consideration of "minor" difficulties in social functioning and "minor" difficulties in concentration, persistence or pace, not "moderate" ones.[25]  (Id; R. at 45.)  According to plaintiff, the

---

[25] Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that a significant number of jobs exist in the national economy that plaintiff can perform.  (Id. at 27, Finding 10.)  Under the Medical-Vocational Guidelines, found in 20 C.F.R. Part 404, Subpart P, Appendix 2, if plaintiff can perform all or substantially all of the exertional demands at a given level of exertion, the rules require a conclusion of either "disabled" or "not disabled" depending on plaintiff's specific vocational profile.  (Id.)  If plaintiff had the RFC to perform a full range of heavy work, a finding of "not disabled would be required."  In this instant case, however, plaintiff's ability to perform all of the requirements of this level of work has been impeded by specific limitations.  In order to determine how plaintiff's limitations affected the number of jobs that plaintiff could perform, the ALJ asked the VE whether jobs exist in the national economy for a person of plaintiff's age, education, work experience and RFC.  (Id.)  In response to the ALJ's questions, Dr. Ryan testified that plaintiff could perform jobs such as laundry worker, grader/sorter or packer/packaging worker, which are all jobs of light exertional level that exist in the national economy.  (Id.)

distinction between "minor" and "moderate" functional limitations is significant and, thus, defendant has failed to meet his burden of producing evidence that plaintiff retains the capacity to perform specific jobs that exist in significant numbers in the national economy. (Pl.'s Mem. in Supp. of Mot. for Summary J. 18-19.)

As an initial matter, the Court notes that plaintiff fails to assert any reason why he is unable to perform any of the jobs that the VE suggested. Moreover, plaintiff himself has stated that he only felt moderately anxious in social situations and mildly anxious at other times and that his work exacerbated the anxiety. (R. at 238.) The work he was referring to was his job as an outreach counselor, which, as discussed above, was very stressful and involved significantly more than minimal contact with the public. The evidence in the record clearly demonstrates, and the ALJ found, that plaintiff could not continue to do the kind of work he did as an outreach counselor. It appears plaintiff's anxiety and depression worsened in the context of that particular work, which is understandable. Such a finding does not, however, mean that plaintiff is unable to perform other, less mentally demanding and stressful work. Logically, there are a myriad of jobs that involve significantly less stress than working as an outreach counselor for juvenile offenders.

The ALJ properly recognized plaintiff's symptoms and limitations and appropriately accounted for them in his decision that jobs exist in the national economy that plaintiff is able to perform.  Indeed, the ALJ concluded that plaintiff's RFC allowed him to perform simple, routine unskilled tasks involving no more than minimal contact with the public, which is the same limitation the VE was directed to consider when opining about jobs available to plaintiff in the economy.  Thus, there is no substantive difference between the characterization of "mild" as opposed to "moderate" limitations in this instance because the factors considered by the VE were the same as those specifically found by the ALJ in his report.  It was the specific limitations of being able to perform only simple, routine, unskilled tasks involving no more than minimal contact with the public upon which the VE based his conclusions that plaintiff could perform various unskilled light occupations.

This Court finds that the ALJ's question to the VE at the hearing sufficiently articulated the information most important to the decision, namely that plaintiff has some difficulty interacting with the public as well as some difficulty with concentration.  Such information regarding plaintiff's limitations was adequately conveyed to the VE and, thus, the ALJ did not rely upon flawed vocational evidence when reaching his conclusions about jobs that plaintiff can perform.

39

Plaintiff also contends that the the vocational evidence relied upon by the ALJ improperly omits consideration of the limitations outlined by Dr. Adewale.  Specifically, in response to a question from plaintiff's counsel about the availability of jobs for a person who has to miss one day a week or four days per month, the VE opined that such a person likely would not be employable.  As discussed above, the ALJ did not find all of Dr. Adewale's opinions to be credible and, thus, is not obligated to consider the VE's answer to a hypothetical that was based on Dr. Adewale's opinions.  Additionally, there is little evidence in the record to suggest that plaintiff would have to miss four days of work per month.  Notably, plaintiff worked for more than 25 years as an outreach counselor and there is no documentation in the record of absenteeism issues during any of that time. Because the ALJ rejected Dr. Adewale's opinion, he did not have to accept the VE's testimony that such an individual would not be employable.

Accordingly, the Court finds no substantive error in the ALJ's decision that jobs exist in the national economy that plaintiff is able to perform.

40

VI.  <u>RECOMMENDATION</u>

For the reasons set forth, the undersigned Magistrate Judge finds defendant's decision in this matter is supported by substantial evidence and does not contain legal error. Therefore, the Motion for Summary Judgment by defendant, Michael J. Astrue, Commissioner of Social Security, shall be GRANTED, and the Motion for Summary Judgment by plaintiff, Robert Koisch, shall be DENIED.  An appropriate Order shall be issued.


_____/s/_____
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE


August 20, 2009
Alexandria, Virginia

41